# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SHANNON MEDICAL CENTER
120 East Harris Ave.
San Angelo, TX 76903,

EARL K. LONG MEDICAL CENTER
5825 Airline Hwy.
Baton Rouge, LA 70805,

E A CONWAY MEDICAL CENTER
aka OCHSNER LSU HEALTH MONROE
4864 Jackson St.
Monroe, LA 71202,

LEONARD J CHABERT MEDICAL
CENTER
1978 Industrial Blvd.
Houma, LA 70363,

LSU HEALTH BOGALUSA MEDICAL
CENTER
433 Plaza St.
Bogalusa, LA 70427,

LSU HEALTH SCIENCES
CENTER – SHREVEPORT
1541 Kings Hwy.
Shreveport, LA 71130,

MEDICAL CENTER OF LOUISIANA
AT NEW ORLEANS
2000 Canal St.
New Orleans, LA 70112,

UNIVERSITY HOSPITAL & CLINICS
aka OCHSNER UNIVERSITY HOSPITAL AND
CLINICS
2390 West Congress
Lafayette, LA 70506,

W O MOSS REGIONAL MEDICAL
CENTER
1000 Walters St.

Civil Action No. _____

Lake Charles, LA 70607,                             )
                                                    )
FAYETTE MEDICAL CENTER                              )
1653 Temple Ave. North                              )
Fayette, AL 35555,                                  )
                                                    )
YAVAPAI REGIONAL MEDICAL CENTER –                   )
WEST                                                )
1003 Willow Creek Rd.                               )
Prescott, AZ 86301,                                 )
                                                    )
YAVAPAI REGIONAL MEDICAL CENTER –                   )
EAST                                                )
7700 East Florentine Rd.                            )
Prescott Valley, AZ 86314,                          )
                                                    )
SONOMA VALLEY HOSPITAL                              )
347 Andrieux St.                                    )
Sonoma, CA 95476,                                   )
                                                    )
GLENDORA OAKS BEHAVIORAL HEALTH                     )
HOSPITAL                                            )
aka EAST VALLEY HOSPITAL MEDICAL                    )
CENTER                                              )
150 West Route 66                                   )
Glendora, CA 91740,                                 )
                                                    )
METHODIST HOSPITAL OF SOUTHERN                      )
CALIFORNIA                                          )
300 W. Huntington Dr.                               )
Arcadia, CA 91006,                                  )
                                                    )
LODI MEMORIAL HOSPITAL                              )
975 S. Fairmont Ave.                                )
Lodi, CA 95240,                                     )
                                                    )
TORRANCE MEMORIAL MEDICAL CENTER                    )
3330 Lomita Blvd.                                   )
Torrance, CA 90505-5073,                            )
                                                    )
NORTH OAKS MEDICAL CENTER, LLC                      )
15790 Paul Vega MD Dr.                              )
Hammond, LA 70403,                                  )
                                                    )
WOMAN'S HOSPITAL                                    )
100 Woman's Way                                     )

10209673                          2

Baton Rouge, LA 70817,                                  )
                                                        )
LAFAYETTE GENERAL SURGICAL                              )
HOSPITAL                                                )
1000 W. Pinhook Rd., Suite 100                          )
Lafayette, LA 70503,                                    )
                                                        )
LIMA MEMORIAL HEALTH SYSTEM                             )
1001 Bellefontaine Ave.                                 )
Lima, OH 45804,                                         )
                                                        )
AKRON GENERAL MEDICAL CENTER                            )
400 Wabash Ave.                                         )
Akron, OH 44307,                                        )
                                                        )
WOOSTER COMMUNITY HOSPITAL                              )
1761 Beall Ave.                                         )
Wooster, OH 44691,                                      )
                                                        )
METROHEALTH MEDICAL CENTER                              )
2500 MetroHealth Dr.                                    )
Cleveland, OH 44109,                                    )
                                                        )
UH PORTAGE MEDICAL CENTER                               )
aka ROBINSON MEMORIAL HOSPITAL                          )
6847 N. Chestnut                                        )
Ravenna, OH 44266,                                      )
                                                        )
UH ELYRIA MEDICAL CENTER                                )
aka EMH REGIONAL MEDICAL CENTER                         )
630 East River St.                                      )
Elyria, OH 44035,                                       )
                                                        )
MEMORIAL HOSPITAL                                       )
715 South Taft Ave.                                     )
Fremont, OH 43420,                                      )
                                                        )
MOUNT NITTANY MEDICAL CENTER                            )
1800 East Park Ave.                                     )
State College, PA 16803,                                )
                                                        )
ROXBOROUGH MEMORIAL HOSPITAL                            )
5800 Ridge Ave.                                         )
Philadelphia, PA 19128,                                 )
                                                        )
                                                        )

LANDMARK MEDICAL CENTER          )
115 Cass Ave.                    )
Woonsocket, RI 02895,            )
                                 )
ASPIRUS WAUSAU HOSPITAL          )
333 Pine Ridge Blvd.             )
Wausau, WI 54401,                )
                                 )
                    Plaintiffs,  )
                                 )
                    vs.          )
                                 )
ROBERT F. KENNEDY, JR., Secretary, )
U.S. Department of Health and Human Services )
200 Independence Avenue, S.W.    )
Washington, DC 20201,            )
                                 )
                    Defendant.   )
                                 )
                                 )
_____  )

## COMPLAINT

Plaintiffs by and through their undersigned attorneys, bring this action against defendant

Robert F. Kennedy, Jr., in his official capacity as the Secretary of the Department of Health and

Human Services, and state as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs, a group of 31 hospitals (the "Hospitals") participating in the Medicare

program, bring this complaint for judicial review of their administrative appeal of the

reimbursements they received for care provided to Medicare patients, and of the policies of the

Secretary of Health and Human Services ("HHS") that determined those reimbursements.  Every

year, the Hospitals and other hospitals around the country treat Medicare patients in need of

serious medical care that is far more costly to provide than is ordinary and well in excess of the

10209673                               4

standard Medicare payment.  Congress created a payment program to reimburse hospitals for these "outlier" cases.  But for many years, including the ones at issue in this case, HHS has implemented the outlier payment program improperly, in a manner that has substantially underpaid hospitals.

2.    The Hospitals here claim that HHS failed to pay them the full amount of outlier payments they are due for treating Medicare inpatients during their various fiscal years ending in 2007, 2008, 2010, 2011, and 2012.  HHS's underpayments flowed directly from its adoption and application of procedurally and/or substantively invalid outlier payment rules governing the Hospitals' outlier reimbursement determinations.  The Hospitals seek a judgment vacating HHS's rules and the reimbursement determinations and remanding them to the agency to recalculate proper outlier payment amounts.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1) (appeal of final Medicare program agency decision).

4.    Venue lies in this judicial district under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1391.

## PARTIES

5.    The Hospitals are non-profit organizations that, directly or through wholly owned subsidiaries, own and operate the acute care hospitals identified in the subparagraphs below. Each of the Hospitals was certified to participate in the Medicare program as a "provider of services" during the time relevant to this Complaint, including, with respect to each hospital, during each of its fiscal years identified below.

a.      Plaintiff Shannon Medical Center, Medicare Provider No. 45-0571, is appealing its payment by HHS for its fiscal year ending 2012.

b.      Plaintiff Earl K. Long Medical Center, Medicare Provider No. 19-0122, is appealing its payment by HHS for its fiscal years ending 2007, 2008, 2010, 2011, and 2012.

c.      Plaintiff E A Conway Health Medical Center, aka Ochsner LSU Health Monroe, Medicare Provider No. 19-0011, is appealing its payment by HHS for its fiscal years ending 2011 and 2012.

d.      Plaintiff Leonard J Chabert Medical Center, Medicare Provider No. 19-0183, is appealing its payment by HHS for its fiscal years ending 2010, 2011, and 2012.

e.      Plaintiff LSU Health Bogalusa Medical Center, Medicare Provider No. 19-0001, is appealing its payment by HHS for its fiscal years ending 2007, 2011, and 2012.

f.      Plaintiff LSU Health Sciences Center – Shreveport, Medicare Provider No. 19-0098, is appealing its payment by HHS for its fiscal years ending 2010 and 2011.

g.      Plaintiff Medical Center of Louisiana at New Orleans, Medicare Provider No. is appealing its payment by HHS for its fiscal year ending 2007.

h.      Plaintiff University Hospital & Clinics, aka Ochsner University Hospital and Clinics, Medicare Provider No. 19-0006, is appealing its payment by HHS for its fiscal years ending 2008, 2010, 2011, and 2012.

i.      Plaintiff W O Moss Regional Medical Center, Medicare Provider No. 19-0161, is appealing its payment by HHS for its fiscal years ending 2007, 2008, 2010, 2011, and 2012.

j.      Plaintiff Fayette Medical Center, Medicare Provider No. 01-0045, is appealing its payment by HHS for its fiscal year ending 2012.

k.      Plaintiff Yavapai Regional Medical Center – West, Medicare Provider No. 03-0012, is appealing its payment by HHS for its fiscal year ending 2012.

l.      Plaintiff Yavapai Regional Medical Center – East, Medicare Provider No. 03-0018, is appealing its payment by HHS for its fiscal year ending 2012.

m.      Plaintiff Somona Valley Hospital, Medicare Provider No. 05-0090, is appealing its payment by HHS for its fiscal year ending 2012.

n.      Plaintiff Glendora Oaks Behavioral Health Hospital, aka East Valley Hospital Medical Center, Medicare Provider No. 05-0205, is appealing its payment by HHS for its fiscal year ending 2012.

o.      Plaintiff Methodist Hospital of Southern California, Medicare Provider No. 05-0238, is appealing its payment by HHS for its fiscal year ending 2012.

p.      Plaintiff Lodi Memorial Hospital, Medicare Provider No. 05-0336, is appealing its payment by HHS for its fiscal year ending 2012.

q.      Plaintiff Torrance Memorial Hospital, Medicare Provider No. 05-0351, is appealing its payment by HHS for its fiscal year ending 2012.

r.      Plaintiff North Oaks Medical Center, LLC, Medicare Provider No. 19-0015, is appealing its payment by HHS for its fiscal year ending 2012.

s.      Plaintiff Woman's Hospital, Medicare Provider No. 19-0128, is appealing its payment by HHS for its fiscal year ending 2012.

t.      Plaintiff Lafayette General Surgical Hospital, Medicare Provider No. 19-0268, is appealing its payment by HHS for its fiscal year ending 2012.

u.      Plaintiff Lima Memorial Health System, Medicare Provider No. 36-0009, is appealing its payment by HHS for its fiscal year ending 2012.

v.    Plaintiff Akron General Medical Center, Medicare Provider No. 36-0027, is appealing its payment by HHS for its fiscal year ending 2012.

w.    Plaintiff Wooster Community Hospital, Medicare Provider No. 36-0036, is appealing its payment by HHS for its fiscal year ending 2012.

x.    Plaintiff MetroHealth Medical Center, Medicare Provider No. 36-0059, is appealing its payment by HHS for its fiscal year ending 2012.

y.    Plaintiff UH Portage Medical Center, aka Robinson Memorial Hospital, Medicare Provider No. 36-0078, is appealing its payment by HHS for its fiscal year ending 2012.

z.    Plaintiff UH Elyria Medical Center, aka EMH Regional Medical Center, Medicare Provider No. 36-0145, is appealing its payment by HHS for its fiscal year ending 2012.

aa.    Plaintiff Memorial Hospital, Medicare Provider No. 36-0156, is appealing its payment by HHS for its fiscal year ending 2012.

bb.    Plaintiff Mount Nittany Medical Center, Medicare Provider No. 39-0268, is appealing its payment by HHS for its fiscal year ending 2012.

cc.    Plaintiff Roxborough Memorial Hospital, Medicare Provider No. 39-0304, is appealing its payment by HHS for its fiscal year ending 2012.

dd.    Plaintiff Landmark Medical Center, Medicare Provider No. 41-0011, is appealing its payment by HHS for its fiscal year ending 2012.

ee.    Plaintiff Aspirus Wausau Hospital, Medicare Provider No. 52-0030, is appealing its payment by HHS for its fiscal year ending 2012.

6.    Defendant Robert F. Kennedy, Jr., is sued in his official capacity as the Secretary of the Department of Health and Human Services, the federal department that contains the Centers for Medicare & Medicaid Services ("CMS").  The Secretary, the federal official

responsible for administration of the Medicare Program, has delegated the responsibility to administer that program to CMS.  Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA").  In this Complaint, the Hospital generally refers to the agency as CMS.

## STATUTORY AND REGULATORY BACKGROUND CREATING HOSPITALS' ENTITLEMENT TO PAYMENT FOR OUTLIER CASES

**A.     For Ordinary Patient Cases, Medicare's Inpatient Prospective Payment System Generally Pays Hospitals Predetermined Amounts, Regardless of Cost**

7.      The Medicare program, established as title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act"), is the federal entitlement program that provides health care insurance to the nation's aged and disabled.

8.      HHS administers the Medicare Act.  CMS, a component within HHS, is responsible for the daily operation and administration of the Medicare program.

9.      Medicare's hospital insurance program, known as Part A, provides certain benefits covering inpatient hospital, nursing facility, home health and hospice services.  Medicare originally paid participating hospitals the "reasonable costs" that they actually incurred in providing inpatient services.  *See* 42 U.S.C. § 1395f(b).  In 1983, Congress replaced that payment mechanism, for inpatient operating costs at nearly all acute-care hospitals, with an "inpatient prospective payment system" ("IPPS").

10.     Under IPPS, rather than reimbursing a hospital for its actual reasonable cost to provide care for a given patient case, CMS generally pays a fixed, prospectively-determined amount assigned to the type of treatment, categorized according to a diagnosis-related group ("DRG").  Generally speaking, CMS pays a fixed amount for each type of inpatient case regardless of the actual costs incurred by the hospital.  42 U.S.C. § 1395ww(d)(1).  Thus,

10209673                                        9

hospitals are generally at financial risk that their costs for treating some patients may exceed the IPPS rates.

**B.    Congress Mandated Outlier Payments to Financially Protect Hospitals from Extraordinarily Costly Cases**

11.    Medicare's IPPS assumes that fixed payments based on cases of average complexity will on average adequately compensate efficiently run hospitals. But Congress recognized that extraordinarily costly cases do occur, the costs of which cannot adequately be covered by the ordinary IPPS reimbursement based on average cases.

> The committee recognizes that under a prospective payment system, there will be cases within each diagnostic category (DRG) that will be extraordinarily costly to treat, relative to other cases within the DRG, because of severity of illness or complicating conditions, and are not adequately compensated for under the DRG payment methodology. The committee amendment, therefore, requires the Secretary to provide additional payments for cases which are extraordinarily costly to treat, relative to other cases within the DRG.

S. Rep. No. 98-23, at 51, reprinted in 1983 U.S.C.C.A.N. 143, 191.

12.    HHS has likewise described outlier payments as being designed "to protect [Medicare-participating hospitals] against extreme losses imposed by exceptionally costly cases under the prospective payment system." 53 Fed. Reg. 38,476, 38,506 (Sept. 30, 1988). "The outlier payment policy is designed to alleviate any financial disincentive hospitals may have against providing any medically necessary care their patients may require, even those patients who become very sick and require extraordinary resources." 68 Fed. Reg. 10,420, 10,426 (March 5, 2003).

13.    The mechanism and policy of supplemental reimbursement for outlier cases are established in section 1886(d)(5)(a) and (d)(3)(B) of the Medicare Act, 42 U.S.C. § 1395ww(d)(5)(A), (d)(3)(B):

> (ii) . . . [a] hospital may request additional payments in any case where charges, adjusted to cost, . . . exceed the sum of the applicable DRG prospective payment

rate plus any amounts payable under subparagraphs (B) and (F)[1]  plus a fixed dollar amount determined by the Secretary.

(iii)    The amount of such additional payments . . . shall approximate the marginal cost of care beyond the cutoff point applicable under clause . . . (ii).

42 U.S.C. § 1395ww(d)(5)(A).

14.    HHS calls the "fixed dollar amount" referred to in clause (ii) and the "cutoff point" referred to in clause (iii), both quoted in the previous paragraph, the "outlier fixed-loss cost threshold," which this Complaint will refer to as the "outlier threshold."

15.    Further, the statute states that the total amount of outlier payments "for discharges in a [fiscal year] may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year."  42 U.S.C. § 1395ww(d)(5)(A)(iv).

16.    HHS determines an outlier threshold each year, with application to patient cases that occur during the coming federal fiscal year.  42 C.F.R. § 412.80.[2]   The Hospitals' claims center on the outlier thresholds that affected their outlier reimbursements, included in the overall reimbursements being appealed.

17.    To determine whether a given inpatient case qualifies for an outlier payment and what the amount of the payment will be, a hospital and its payment contractor need to know the outlier threshold applicable at the time of the patient's discharge, the hospital's charges for the

---

[1] The subparagraphs (B) and (F) referenced in this clause of the outlier statute address certain add-on payments to offset the costs of graduate medical education and care of low-income patients (*see* 42 U.S.C. § 1395ww(d)(5)(B), (F)) that are not at issue in this action.

[2] *See*, e.g., 71 Fed. Reg. 47,870, 48,151 (August 18, 2006) (fiscal year 2007); 72 Fed. Reg. 47,130, 47,419 (Aug. 22, 2007) (fiscal year 2008); 73 Fed. Reg. 48,434, 48,764 (Aug. 19, 2008) (fiscal year 2009); 74 Fed. Reg. 43,754, 44,011 (Aug. 27, 2009) (fiscal year 2010); 75 Fed. Reg. 50,042, 50,430 (Aug. 16, 2010) (fiscal year 2011); 76 Fed. Reg. 51,476, 51,795 (Aug. 18, 2011) (fiscal year 2012); and 77 Fed. Reg. 53,258, 53,696 (Aug. 31, 2012) (fiscal year 2013).

case, and certain additional hospital-specific figures (including the "cost-to-charge ratio," discussed below). The level at which HHS sets the outlier threshold for a given period determines both how many inpatient cases will qualify for outlier payments and the amount of outlier payments for qualifying cases—the higher the outlier threshold, the fewer cases that qualify and the smaller the payment amounts for each.

C.     **HHS's Rules for Calculating Outlier Payments—the Annual Outlier Thresholds and Payment Criteria**

18.     The Medicare statute grants HHS rulemaking authority to promulgate regulations to administer the Medicare program, specifying that the rulemaking process must include a public comment period of at least 60 days. 42 U.S.C. § 1395hh(a)(1), (b)(1). The statute also requires that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services" must go through this rulemaking process. *Id*. § 1395hh(a)(2). The Supreme Court has explained that this broad rulemaking requirement (a) does not apply only to the establishment or changing of rules with the force and effect of law, but could also apply to guidance that governs "payment for services," and (b) is in addition to the procedural requirements of the APA. *See Azar v. Allina Health Services*, 139 S. Ct. 1804, 1811 (2019).

19.     HHS's regulations that govern outlier payments are codified at 42 C.F.R. §§ 412.80 through 412.86. The outlier payment regulations establish the method for calculating a hospital's costs for a patient case and other criteria for outlier payments.

20.     HHS first promulgated the outlier payment regulations in 1985 and has amended them several times since then, most notably in 2003 when it attempted to correct several flaws that it said made them "uniquely susceptible" to abuse, as discussed below in paragraphs 25 through 29.

10209673                                      12

21.    As previously noted, the statute states that the total amount of outlier payments "for discharges in a [FY] may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year." 42 U.S.C. § 1395ww(d)(5)(A)(iv). HHS has interpreted this mandate as requiring HHS to set the outlier threshold at a level that is "likely to produce aggregate outlier payments totaling between 5 and 6 percent of projected or estimated DRG payments." *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1013 (D.C. Cir. 1999). In each outlier threshold rulemaking relevant to this case, and for years before and after those rulemakings, HHS has said it sets the outlier threshold at a level that it believes will result in outlier payments equal to 5.1% of total projected DRG payments.

22.    HHS sets the outlier threshold annually by forecasting the amount of total outlier payments that it would make under various hypothetical outlier thresholds during the upcoming FY.[3] HHS then selects an outlier threshold that it concludes will produce aggregate outlier payments in an amount equal to 5.1% of the total DRG-based payments it will be making for inpatient care.

23.    Outlier payments are effectively funded each year through a reduction in the IPPS DRG rates for ordinary cases equal to the same 5.1 percent of forecast total outlier payments. *See* 42 U.S.C. § 1395ww(d)(3)(B). Thus, when HHS determines that its selection of an outlier threshold will result in a certain amount of outlier payments, HHS reduces the rates for ordinary case payments by a corresponding amount from what HHS had determined to be the appropriate DRG payments. If the total outlier payments fall short of HHS's assessment, then the amount of

---

[3] See rulemakings cited *supra* in fn. 2.

Medicare reimbursements overall for a given year will be short of HHS's own determination of the proper level of payments.

24.    Total outlier payments amount to roughly $5 billion per year.  Consequently, even errors in the outlier threshold that may seem numerically small can reduce outlier payments to hospitals by many hundreds of millions of dollars.  Because HHS deducts its forecast of outlier case payments from the ordinary payment rates, underpayments caused by errors in the outlier threshold reduce IPPS overall.

**D.    Background: From 1998-2003, HHS Redistributed over $10 Billion in Outlier Funds to 3% of Hospitals that Had Gamed the System While Underpaying All Others by Further Billions**

25.    Although not challenged by the Hospitals, HHS's regulations for outlier payments from October 1998 through approximately mid-2003 were flawed and caused massive errors. The knowledge HHS gained from this period and the regulatory changes it adopted in 2003 provided important information relevant to HHS's later rulemakings that are at issue in this action.

26.    A hospital's eligibility for an outlier payment for treating a given patient, and the amount of any outlier payment it may receive for that patient case, depend on the extent to which the hospital's imputed costs for the case exceed the sum of the outlier threshold and the regular DRG case payments.  The hospital's costs are calculated, for this purpose, by multiplying its charges for the case by the hospital's average "cost-to-charge ratio" ("CCR").  The CCR is the ratio of all of a hospital's inpatient treatment costs to all of its inpatient treatment charges for discharges in a given hospital fiscal year.[4]   Hospitals file cost reports annually after the close of

---

[4] A hospital's fiscal year will not necessarily line up with the federal fiscal year.  The Hospitals' respective fiscal years end at various dates during the calendar year, including generally June 30, September, 30, and December 31.  Thus, most of the Hospitals' fiscal years span multiple federal fiscal years.  The CCR is calculated based on a hospital's given fiscal year, but the outlier payment

their respective accounting years, and Medicare contractors use the cost report data to compute

updated CCRs.

27.    From 1997 until 2003, HHS's outlier payment regulations were vulnerable to a

particular strain of manipulation.  HHS calculated outlier payments using CCRs that either were

several years old at the time of payment or, worse still, had been defaulted (pursuant to an HHS

regulation) permanently to an artificially high statewide average.  A very small subset of

hospitals took advantage of these vulnerabilities by rapidly increasing their billed charges—a

practice known after the fact as "turbo-charging."  The turbo-chargers' increased charges

multiplied by their inaccurately high CCRs under the regulations produced enormously inflated

costs and enormous outlier payments.

28.    Those turbo-charged claims led HHS over a six-year period to pay turbo-chargers

roughly $10 billion in excess total outlier payments.  Instead of fixing the problem, HHS tried to

cut back ballooning payments by ramping up the outlier threshold almost 250%, thus enormously

underpaying the vast majority of hospitals that were not turbo-charging.  The head of CMS

testified to Congress:

> As outlier claims increased (and the agency had no idea why) the outlier threshold
> has skyrocketed-from $14,050 in 2000 to $33,560 in 2003-as the agency raised the
> bar to try (very unsuccessfully) to stay within the 5.1 percent target. As a direct
> result, more hospitals have been forced to absorb the costs of the complex cases
> they treat, while a relatively small number of hospitals that have been aggressively
> gaming the current rules benefit by getting a hugely disproportionate share of
> outlier payments.

Medicare Outlier Payments to Hospitals: Hearing Before Subcomm. on Labor, Health & Human

Services, and Education, 108th Cong. 108-268, at 7 (2003) (testimony of Thomas Scully, CMS

for a particular patient case depends also on, among other payment variables, the fixed-loss
threshold, which changes with the federal fiscal year.

Administrator) *available at:* https://www.congress.gov/108/chrg/CHRG-108shrg85832/CHRG-108shrg85832.pdf

29.     In 2003, HHS finally acknowledged how its payment regulations had spawned turbo-charging and amended them to curtail that practice. The revisions required the use of more recently updated CCRs and eliminated the practice of defaulting extremely low CCRs to much higher statewide average CCRs. *See* 68 Fed. Reg. 34,494, 34,497-34,500 (June 9, 2003). Another key change was that outlier payments would now be subject to correction after the fact through a process of audit and reconciliation. HHS recognized that potential reconciliation was necessary because CCRs, though now computed from more current data, would still be roughly 9-16 months out of date when used to pay claims; thus, a hospital could still "manipulate outlier payments by dramatically increasing charges during the year in which the discharge occurs." *See id*. at 34,501. However, despite acknowledging that its outlier thresholds had been determined based on fatally flawed outlier regulations, which it was overhauling, HHS left in place the all-time-high, turbo-charged 2003 outlier threshold. *See id*. at 34,505-34,506.

30.     However, during the 2003 rulemaking, HHS had prepared a draft interim final rule that, if finalized, would have resulted in a much lower, and more accurate, outlier threshold calculation. HHS's draft interim final rule recalculated the 2003 outlier threshold using certain methodologies that were different from what HHS had been using. Most significantly, HHS recognized that because charges generally increase faster than cost, CCRs tend to decrease over time; meanwhile, HHS would be paying hospitals based on more recent CCRs. Consequently, to determine an outlier threshold that would meet the 5.1 percent payment target, HHS would need to forecast payments based on updated, presumably lower CCRs. Using past CCRs without such an update would cause overcalculations of the amount of outlier payments at a given outlier

threshold, and would thus lead HHS to choose an inappropriately high outlier threshold. Applying this methodology in the draft interim final rule, HHS said the 2003 outlier threshold should be lowered from $33,560 to $20,760, a decrease of 40 percent.

31.    The methods developed in the draft interim final rule remained relevant as HHS chose outlier thresholds for federal fiscal year 2006 and beyond. Had HHS adopted those methods in the federal fiscal year 2006 rulemaking, the outlier threshold for that year would have been lower. But HHS did not publish the draft interim final rule or even notify the public of its existence. The draft interim final rule came to light only in the course of litigation by other hospitals challenging their reimbursements under the federal fiscal year 2003 and subsequent outlier thresholds, years later.

32.    Said failures to disclose HHS's consideration of the draft interim final rule and its underlying material and analyses deprived hospitals of valuable information, and limited their ability to comment on HHS's proposed outlier threshold rulemakings for federal fiscal years 2006 through 2013.[5] Further, by ignoring the analysis in the draft interim final rule, HHS also ignored the fact that its payment system continued in federal fiscal years 2004-2006 to underpay the legitimate claims of non-turbo-charging hospitals. Had HHS addressed this aspect of the problem, HHS would have had in place a sound process to set the outlier threshold prior to the federal fiscal years at issue here. Among other things, in its federal fiscal years 2004-2006 outlier threshold rulemakings, HHS ignored the fact that the hospital cost-to-charge ratios it used

---

[5] The Hospitals concede that precedents of the D.C. Circuit foreclose arguments that HHS was required to disclose the contents of the draft interim final rule to permit public comment during its outlier threshold rulemakings, or that the draft interim final rule itself was a rule to which HHS was obligated to adhere. Although the Hospitals intend to preserve such arguments for the possibility that the relevant precedent may be overturned, the allegations in this section are otherwise included only as background material providing context for the Hospitals' allegations regarding later rules.

to set the outlier threshold would decline prior to and during the coming fiscal year.  Due to

HHS's failure to account for this (and for other reasons), *Banner Health v. Price*, 867 F.3d 1323,

1348-53 (D.C. Cir. 2017), remanded HHS's rulemakings setting the outlier thresholds for federal

fiscal years 2004 through 2006.

**E.**    **HHS Set Outlier Thresholds For Fiscal Years 2006-2013 Irrationally and/or Without**
        **Properly Following Notice and Comment  Requirements**

      1.    <u>HHS Failed to Account Properly for Decreasing CCRs</u>.

      33.    Even after the 2003 change to payment processes, HHS still needed to account for

the basic dynamics of CCRs.

      34.    HHS calculated the outlier threshold during February through August each year,

using for its final calculation CCR data that had been updated as of March during the course of

the rulemaking.  The federal fiscal year for which the outlier threshold would apply would begin

the following October 1, at least 6 months later than the latest CCR data being used, and run

through September 30 the following year, at least 18 months later than that data.  In HHS's

system, the payment contractors would update all hospital CCRs at least once and for some

hospitals (depending on the timing of a given hospital's accounting year) twice before the end of

that federal fiscal year.  HHS has also assumed, since at least its federal fiscal year 2002 outlier

threshold rulemaking, that in general and on average hospital CCRs decrease over time, because

average hospital charges per case have been increasing faster than average hospital costs per

case.  Consequently, it was routine and foreseeable that the CCRs used to pay outlier claims

during the upcoming federal fiscal year would be lower than the March CCRs used in

determining the outlier threshold.  Given how outlier payments are calculated, that would mean

the actual outlier payments would be predictably lower than the payments HHS would calculate

based on the March CCRs.

35.     Thus, unless HHS reasonably accounted for this persistent trend of decreasing CCRs, it would calculate higher outlier payments than would in fact occur, and it would then set the outlier threshold at a level that was too high and was not in fact reasonably calculated to pay out aggregate outlier payments at HHS's 5.1 percent target.

36.     In determining the federal fiscal year 2004-2006 outlier thresholds, as previously noted, HHS ignored this issue.  The resulting outlier payments were, predictably, substantially below the 5.1 percent target, and the D.C. Circuit ruled that those thresholds were arbitrary and capricious.  *Banner Health v. Price*, 867 F.3d at 1348-53.

37.     In the federal fiscal year 2007 outlier threshold rulemaking, HHS proposed to use the same methods and policies that it had used to set the outlier threshold for federal fiscal year 2006, including simply using the latest updated CCRs from March of that year without adjustment.  71 Fed. Reg. 23,996, 24,149-24,150 (April 25, 2006).

38.     Secretly, however, HHS had the draft interim final rule in its possession that showed a simple, reliable method to account for the decline in CCRs.  Namely, HHS could simply take the most recent average annual rate of decline in CCRs and reduce the March CCRs accordingly to account for the 6- to 18-month period before the CCRs would be used for actual cases.

39.     In addition, HHS developed, internally, a different method to account for the decrease in CCRs, involving a convoluted calculation that used averages of the "market basket" rate of cost inflation over one time period, hospital cost inflation data over a different time period, and ratio of the two to come up with a decrease to apply to the CCRs.

40.     HHS did not disclose for comment either of the two methods just mentioned, or publish or provide public notice of the documents in its possession about the methods, or any data or analysis it used to develop either method.

41.     Instead, in its final rule for the federal fiscal year 2007 outlier threshold, HHS unveiled the fact that it had developed and applied a method/policy to project decreases in CCRs along with the resulting percentage decrease using the method it had applied. *See* 71 Fed. Reg. 47,870, 48,150 (Aug. 18, 2006). This announcement was the first time HHS had indicated to the public that it had even considered adjusting CCRs in its outlier threshold determinations.

42.     In its final rule, HHS did not explain why it chose the particular time periods it used for the averages, or any other methodological decision. It simply asserted that its method was "more accurate and stable" than a method that commenters had urged it to adopt. (The commenters' method was, unbeknownst to them, similar to what HHS developed in the draft interim final rule.)

43.     HHS's method produced a CCR adjustment that was next to nothing: -0.2 percent, which was roughly one-tenth the size of the decrease the method in the draft interim final rule would have produced. The actual change in CCRs turned out to be -2.0 percent, much larger than HHS's forecast, and closer to what the draft interim final rule's method produced. The outlier threshold resulting from HHS's inadequate adjustment was, consequently, way too high, and HHS ended up paying at least $400 million less in outlier payments than its 5.1 percent target.

44.     In the fiscal year 2008 rulemaking, HHS also did not give adequate notice or an opportunity to comment on how it would account for declining CCRs or on the underlying data. HHS's proposed rule for fiscal year 2008 said HHS would adjust CCRs, using the method

adopted in the fiscal year 2007 final rule, with a slight percentage decrease. 72 Fed. Reg. 24,680, 24,836-37 (May 3, 2007). But the final fiscal year 2008 rule projected the opposite— that CCRs would increase—a projection that was directly counter to the assumptions built into HHS's entire threshold-setting methodology. 72 Fed. Reg. 47,130, 47,418 (Aug. 22, 2007). That forecast of an increase was also directly contrary to long historical experience of declining CCRs. HHS provided no notice of this unexpected, unexplained prediction that history would reverse course; commenters had no opportunity to comment on the fact that HHS's method/policy had produced this irrational result. The fiscal year 2008 threshold was again too high, and HHS's outlier payments ended up being hundreds of millions of dollars below its target.

45. HHS repeatedly refused to respond to comments other than stating it had previously decided its method for adjusting CCRs was appropriate. In each of its fiscal year 2008 through 2013 proposed outlier threshold rules, HHS treated its method/policy to project CCRs decreases, adopted in the 2007 rulemaking, as a settled matter that was not open for consideration. *See, e.g.*, 72 Fed. Reg. at 24,836-37 (fiscal year 2008 proposed rule); 73 Fed. Reg. 23,528, 23,710-11(April 30, 2008) (fiscal year 2009 proposed rule); 74 Fed. Reg. 24,080, 24,245-46 (May 22, 2009) (fiscal year 2010 proposed rule) 75 Fed. Reg. 23,852, 24,068-69 (May 4, 2010) (fiscal year 2011 proposed rule); 76 Fed. Reg. 25,788, 26,024-25 (May 5, 2011) (fiscal year 2012 proposed rule); 77 Fed. Reg. 27,870, 28,142-43 (May 11, 2012) (fiscal year 2013 proposed rule).

46. And in each of those rules, HHS applied this same method/policy developed in the fiscal year 2007 rulemaking without undertaking any serious consideration of public input on flaws or logical errors in the method. *See, e.g.*, 72 Fed. Reg. at 47,418 (fiscal year 2008 final

rulemaking notice); 75 Fed. Reg. at 50,429 (Aug. 16, 2010) (fiscal year 2011 final rulemaking notice); 76 Fed. Reg. at 51,794 (Aug. 18, 2011) (fiscal year 2012 final rulemaking notice).

47.     HHS never considered or acknowledged the fact that its method had predicted that CCRs would unexpectedly increase in fiscal year 2008, or that this prediction turned out to be far from the mark.  CCRs ended up decreasing in fiscal year 2008, just as the draft interim final rule's method would have predicted.

48.     Furthermore, in each of the fiscal years 2007 through 2013 outlier threshold rulemakings, the method that HHS used to project the rate of decrease in CCRs repeatedly produced inaccurate forecasts that CCRs would be significantly higher than the actual CCRs that resulted for same periods.

49.     Commenters on each of the fiscal years 2008–2013 outlier threshold rulemakings repeatedly raised these and other flaws and suggested alternatives that would yield more accurate projections.

50.     However, HHS repeatedly refused to consider the substance of those comments and suggestions, providing, instead, the same basic response that rested on the establishment of its method in the final rule for fiscal year 2007:  "[A]s we stated in the FY 2007 IPPS final rule,.. we believe this calculation of an adjustment to  the CCRs is more accurate and stable than the commenters methodology."  72 Fed. Reg. at 47,418 (Aug. 22, 2007) (fiscal year 2008 final rulemaking notice).  *See also, e.g.*, 75 Fed. Reg. at 50,429 (Aug. 16, 2010) (fiscal year 2011 final rulemaking notice) ("[A]s we stated in the FY 2008 IPPS final rule . . . we continue to believe this calculation of an adjustment to the CCRs is more accurate and stable than the commenter's methodology."); 76 Fed. Reg. at 51,794 (Aug. 18, 2011) (fiscal year 2012 final rulemaking

notice) ("[W]e continue to believe this calculation of an adjustment to the CCRs is more accurate and stable than the commenter's methodology.").

51.    In addition, since HHS had withheld key data and analysis it had used to develop its policy/method for projecting CCRs in the fiscal year 2007 rulemaking, commenters were unable to consider and use that data and analysis in connection with their comments each time HHS said it was going to use the policy/method again.

52.    HHS used its repeatedly inaccurate projections of CCR decreases to select the outlier threshold in fiscal years 2007 through 2013.  This led HHS to use inflated CCRs, which in turn directly and inevitably led HHS to overestimate how much it would pay in total outlier payments using a given threshold.  As a consequence, HHS then selected excessively high outlier thresholds, which resulted in total outlier payments substantially below HHS's 5.1 percent annual target and the corresponding amounts that the agency had withheld from DRG payments.

53.    The method that HHS established in the 2007 rulemaking failed to solve the problem that HHS had acknowledged when the agency adopted the method.  Data used by HHS in the 2007 through 2013 rulemakings demonstrated this failure each year.  Moreover, the data continued to accumulate year by year such that it was irrational for HHS not to have considered adopting a revised method/policy for computing the threshold, or at least to have provided a reasoned explanation as to why HHS was refusing to do so.  Instead, HHS arbitrarily and capriciously, and without properly satisfying its obligations to respond to comments, persisted in a process that consistently produced failed results.[6]

---

[6] The Hospitals concede that precedents of the D.C. Circuit foreclose certain arguments that HHS's fiscal years 2007 through 2011 outlier thresholds were arbitrary and capricious.  To the extent the allegations herein raise such foreclosed arguments, the Hospitals intend to preserve such arguments for the possibility that the relevant precedent may be overturned and as additional context for the Hospitals' claims

2.      HHS Failed to Account for the Impact of Reconciling and Recouping Outlier Payments.

54.     When setting the fiscal year 2006 through 2013 outlier thresholds, HHS overestimated outlier payments and set an excessive outlier threshold, in part, because it failed to account for projected claims that would be recouped via reconciliation.

55.     As previously described, HHS's revisions to the outlier payment regulations in 2003 require the audit and reconciliation of outlier payments to address the possibility that hospitals could still increase their charges to receive excess outlier payments.  It was "necessary to establish a mechanism whereby an adjustment can be made to ensure payments appropriately reflect the marginal cost of care for outlier cases."  Medicare Outlier Payments to Hospitals: Hearing Before a Subcomm. of the S. Comm. on Appropriations, *supra*, 108th Cong. 268, at 51 (2003) (responses to Questions Submitted by Senator Arlen Spector to the HHS).

56.     Every year since fiscal year 2004, commenters asked HHS to take into account the impact of reconciliation when it establishes the outlier threshold.  The nature of reconciliation is that after an initial calculation of a hospital's outlier payments in a given cost report, the payment contractor will revisit the payments, and then possibly recalculate them and recoup some amount of overpayment.  Thus, to some extent, payments that are made during a year will actually be taken back, and the true amount of total outlier payments will be lower than at first appears.

57.     HHS repeatedly refused to "mak[e] any adjustments for the possibility that hospitals' [CCRs] and outlier payments may be reconciled upon cost report settlement." *See, e.g.*, 71 Fed. Reg. at 24,150 (proposed 2007 outlier threshold).  Each time, HHS recited the same three reasons for disregarding the impact of reconciliation: (1) "CCRs will no longer fluctuate significantly and, therefore, few hospitals will actually have these ratios reconciled upon cost

report settlement"; (2) "it is difficult to predict which specific hospitals will have … outlier payments reconciled in their cost reports in any given year"; and (3) "[o]ur simulations assume that CCRs accurately measure hospital costs and, therefore, are more indicative of post-reconciliation than pre-reconciliation outlier payments."  71 Fed. Reg. at 48,149; *see also* 72 Fed. Reg. 47,130, 47,418 (Aug. 22, 2007); 73 Fed. Reg. 48,434, 48,765 (Aug. 19, 2008); 74 Fed. Reg. 43,754, 44,008-9 (Aug. 27, 2009); 75 Fed. Reg. 50,042, 50,429 (Aug. 16, 2010); 76 Fed. Reg. 51,476, 51,794 (Aug. 18, 2011); 77 Fed. Reg. 53,258, 53,692 (Aug. 31, 2012).  These explanations were irrational and contrary to the record before CMS.  *See* Dep't of Health and Human Serv., Office of Inspector Gen., *The Centers for Medicare & Medicaid Services Did Not Reconcile Medicare Outlier Payments in Accordance with Federal Regulations and Guidance*, at 9 (June 28, 2012) (A-07-10-02764)[7] (finding that CMS's payment contractors had identified and referred $664 million in claims subject to reconciliation for periods from 2003 through 2008).[8]

3.    <u>HHS's Outlier Threshold Rulemakings Were Invalid for Several Other Reasons</u>.

58.    HHS's fiscal year 2006 through 2013 outlier thresholds were substantively and/or procedurally invalid for multiple additional reasons including, among others, the following:

a.    For these outlier threshold rulemakings, HHS failed to respond reasonably to public comments that its estimates of prior years' outlier payments (which informed its process for setting the coming year's outlier threshold) were inaccurately high, due to HHS's use of a

---

[7] *Available at*: <u>The Centers for Medicare & Medicaid Services Did Not Reconcile Medicare Outlier Payments in Accordance With Federal Regulations and Guidance (A-07-10-02764)</u>

[8] As noted *supra*, (1) the Hospitals concede that precedents of the D.C. Circuit foreclose certain arguments that HHS's fiscal years 2007 through 2011 outlier thresholds were arbitrary and capricious and (2), to the extent the allegations herein raise such foreclosed arguments, the Hospitals intend to preserve such arguments for the possibility that the relevant precedent may be overturned and as additional context for the Hospitals' claims.

flawed methodology and/or data. HHS unreasonably rejected commenters' suggestions to use superior methodology and/or data for these important estimates.

b.    For these outlier threshold rulemakings, HHS failed to use the most current available data on hospital CCRs when setting the outlier threshold. Commenters repeatedly suggested that HHS use CCR data that had been updated in June rather than data from March. HHS repeatedly rejected these suggestions, asserting (inaccurately) that it lacked enough time to incorporate the June data into the final outlier threshold, and provided no supporting analysis regarding why doing so was not feasible. Upon information or belief, HHS's practice for each federal fiscal year at issue was to run its final computations to set the outlier threshold after the June CCR update was available. HHS has confirmed in other contexts that it did use, in its outlier threshold determinations, some other data more recent than the March data.

c.    Disregarding the suggestions of commenters, and without reasonable explanation, HHS refused to apply an "estimate adjustment factor" when setting the outlier threshold in order to achieve greater accuracy when setting the threshold.

d.    Moreover, HHS repeatedly failed to publish, or otherwise disclose, data and methodologies used (or at least considered) in its outlier threshold rulemaking, including information and data relating to its estimates of past outlier payments and information relating to its calculation of charge inflation, even after commenters had specifically requested access to such data.

59.    As a consequence of these substantive and procedural deficiencies, and others that may be discovered in this action, HHS set outlier thresholds that were too high. These outlier thresholds did not comply with HHS's asserted statutory mandate to choose a threshold that is "likely to produce aggregate outlier payments" at the agency's target of the 5.1% of total DRG

payments. *Cnty. of L.A.*, 192 F.3d at 1013. The excessively high outlier thresholds then caused the Hospitals to receive less in outlier payments and total program reimbursement than they should have.[9]

60.     The Hospitals' payment determinations at issue must be reopened, and the outlier thresholds recalibrated and reset in a lawful manner, so that the Hospitals may receive additional outlier payments and corrected total reimbursement.

## PROCEDURAL BACKGROUND

61.     HHS makes payments to providers through payment contractors, which are private companies that process Medicare claims as HHS's agents.

62.     In connection with receiving reimbursement from HHS for providing covered services to Medicare beneficiaries, each of the Hospitals submitted to its payment contractor a cost report at the end of each of its fiscal years referenced above in paragraph 5.

63.     The payment contractor audited each of the Hospitals' cost reports and, with respect to each, issued a "Notice of Program Reimbursement" (NPR), which is a final determination as to the amount of total program reimbursement a hospital is due for its subject fiscal year. Some of the NPRs were not timely issued under HHS regulations.

64.     The Hospitals exercised their statutory right appeal their total program reimbursement for the fiscal years referenced above in paragraph 5, and to claim additional reimbursement, through filing timely appeals with the agency's administrative hearing board, the Provider Reimbursement Review Board ("Board"), after receipt of the Hospitals' NPRs and/or

---

[9] As noted *supra*, (1) the Hospitals concede that precedents of the D.C. Circuit foreclose certain arguments that HHS's fiscal years 2007 through 2011 outlier thresholds were arbitrary and capricious and (2), to the extent the allegations herein raise such foreclosed arguments, the Hospitals intend to preserve such arguments for the possibility that the relevant precedent may be overturned and as additional context for the Hospitals' claims.

within the deadline after the payment contractor failed to timely issue an NPR.  *See* 42 U.S.C. § 1395oo; 42 C.F.R. § 405.1807.

65.    The Board found that the Hospitals' appeals satisfied the prerequisites for Board jurisdiction and that the Hospitals are entitled to a hearing before the Board on their appeals.  *See* May 28, 2025 Board Decision at 7 and 9, filed herewith as Exhibit A; July 9, 2025 Board Decision at 6 and 8, filed herewith as Exhibit B.

66.    In all of the appeals, the Hospitals requested that the Board grant expedited judicial review ("EJR"), because the final outlier payment determinations of the payment contractor "involve[] a question of law or regulations relevant to the matters in controversy that [the Board] is without authority to decide ...." *See* 42 U.S.C. § 1395oo(f). The question on which the Hospitals requested EJR was summarized as follows:

> Whether the Providers received the reimbursement Congress intended under the Medicare Act for treating certain cases that incurred extraordinarily high costs? Was the cost outlier threshold set improperly?

67.    The Board, recognizing that it is without authority to decide that question, granted the Hospitals' requests for EJR in decisions dated May 28, 2025, for some of the Hospitals, and July 9, 2025, for the rest.  *See* Exhibits A and B.

68.    The Hospitals timely filed this action under 42 U.S.C. § 1395oo(f) within 60 days of the Board's EJR decisions.

## HHS's OUTLIER THRESHOLDS AND CONSEQUENT PAYMENT DETERMINATIONS ARE UNLAWFUL AND MUST BE REVERSED

69.    The Medicare statute provides for judicial review of the questions presented here "pursuant to the applicable provisions under chapter 7 of title 5," *i.e.*, the APA.  42 U.S.C. §1395oo(f)(l).

70.    The applicable provisions of the APA direct that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).  Applying these standards, HHS's outlier thresholds, and outlier payment determinations based thereon, should be found to be unlawful and set aside, including for the reasons detailed below.

**COUNT I**
**HHS's Fiscal Years 2006 through 2013 Outlier Thresholds, and Outlier Payment Determinations Based Thereon, Were Arbitrary and Capricious, Contrary to Law, and/or Applied Without Observance of Procedure Required by Law Under the APA**

71.    The allegations set forth in the preceding paragraphs are repeated and re-alleged.

72.    Each Hospital participated in Medicare and was eligible to receive IPPS reimbursements for patient care provided during the relevant time periods noted above in paragraph 5.

73.    Each Hospital was eligible, during its relevant time periods, to receive outlier payments for patient cases that qualify as outliers.

74.    HHS is required, under the Medicare Act, to provide notice and comment for substantive legal standards such as the threshold determining outlier payments.  Each of HHS's outlier threshold determinations was a rule and a substantive legal standard.  HHS's rules are to be reviewed, in their substance, using the standards of the Administrative Procedure Act.

75.    HHS's determinations of the outlier thresholds governing the Hospitals' respective outlier payments were arbitrary and capricious; were an abuse of discretion; were otherwise not in accordance with law; and/or were performed without observance of procedures required by law.

76.     In addition or in the alternative, each of the methods that HHS used in each of the fiscal years 2006 through 2013 to set the thresholds, including the method to project decreases in CCRs, is a "rule" within the definition of the Administrative Procedure Act, 5 U.S.C. § 551(3), and a substantive legal standard under the Medicare Act.

77.     As a consequence of the defects in its outlier threshold determinations and in its methods to choose the threshold, HHS's outlier thresholds were too high.  The outlier threshold directly affects which patient cases qualify as outliers and the amount of reimbursement for a given patient case.  Each Hospital had patient cases that qualified for outlier payments and should have received greater reimbursement, and additional patient cases that should have qualified for outlier payments, if HHS had set the outlier thresholds properly, and lower.

78.     The Hospitals' final determinations of total program reimbursement were arbitrary and capricious and contrary to law, because they depended on outlier thresholds that were themselves invalid.

### **REQUEST FOR RELIEF**

WHEREFORE, the Hospitals respectfully request as follows:

1.     That the Court rule that HHS's rules implementing the outlier payment mechanism in the Medicare Act, as applicable for the fiscal years here at issue, were (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and/or (B) issued without observance of procedure required by law;

2.     That the Court enter an order (a) vacating the outlier thresholds for the fiscal years here at issue; and (b) remanding these appeals for HHS to: (i) recalculate and reset the outlier thresholds, (ii) permit the Hospitals to submit amended claims for outlier payments for their

respective NPRs at issue in accordance with the revised outlier thresholds, and (iii) re-determine the Hospitals' NPRs and pay the proper amount of outlier payments;

3.      That the Court order HHS to pay the interest due under the Medicare Act for such claims as the Hospitals present here;

4.      That the Court order HHS to pay legal fees and costs of suit incurred by the Hospitals; and

5.      Such other relief as the Court may consider appropriate.

Dated: July 25, 2025                    Respectfully submitted,

                                        By:   /s/ Sven Collins
                                        Sven Collins, Esq. (Colorado Bar No. 30890)
                                        HOOPER, LUNDY & BOOKMAN, P.C.
                                        999 18th Street, Suite 3000
                                        Denver, Colorado  80202
                                        Tel:  (720) 687-2850
                                        Email: scollins@hooperlundy.com

                                        *Attorneys for Plaintiff*